Walter R. Laudenslager and Marguerite Laudenslager v. Commissioner.
Laudenslager v. Commissioner
Docket No. 80755.
United States Tax Court
T.C. Memo 1961-85; 1961 Tax Ct. Memo LEXIS 264; 20 T.C.M. (CCH) 384; T.C.M. (RIA) 61085; March 28, 1961
*264 Sale of earth fill by landowner pursuant to contract occurred from time to time as fill was removed. The contract did not by itself effect a sale of the fill "in place", and therefore did not represent a sale of a portion of the real estate. Accordingly, the profit realized upon such sales did not represent capital gain. Samuel L. Green, 35 T.C. -, decided this day, followed. Morris J. Oppenheim, Esq., 601 Bangs Ave., Asbury Park, N.J., for the petitioners. Sheldon Seevak, Esq., and Gerald N. Daffner, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in the income tax of petitioners in the amounts of $13,089.28 for the year 1953 and $12,380.81 for the year 1954. The sole remaining issue for decision is whether certain amounts, which petitioners received from a contractor for fill dirt used in the construction of a highway, constituted proceeds from the sale of capital assets, or ordinary income. In an Amendment to Answer, respondent claims an increased deficiency for the year 1954. Findings of Fact Most of the facts have been stipulated, and, as stipulated, they are incorporated herein by reference. *265 Petitioners, husband and wife, are residents of Red Bank, New Jersey. They filed joint income tax returns for the years 1953 and 1954 with the district director of internal revenue, Camden, New Jersey. On October 1, 1945, petitioners purchased certain lands located in Middletown Township, Monmouth County, New Jersey, together with buildings located thereon. They used the property as a residence and farm. In 1952 the New Jersey Parkway Authority fixed and announced the alignment for a proposed limited access, toll highway which cut across a section of petitioners' property. A portion of their property was taken in condemnation by the Authority and the highway was thereafter constructed. Petitioners' remaining property was located approximately 300 to 400 feet from the Red Bank entrance to the new highway. The coming of the parkway to this area made it desirable for housing development. Because of its proximity to the entrance to the highway, petitioners' property became particularly desirable for such purposes and, even before the alignment of the new road had been definitely established, petitioners were approached by real estate agents seeking to interest them in selling it. *266 Petitioners were also sought out by Emerson Branham, resident manager for George M. Brewster & Son, Inc. (hereinafter referred to as Brewster), a road building contractor, to determine whether it could buy a section of petitioners' farm from which "borrow" material (fill required for the road construction) could be obtained. Brewster subsequently became the successful bidder for the contract to construct the section of the highway adjacent to petitioners' property. Brewster's contract with the New Jersey Highway Authority provided that it would be the responsibility of the contractor to acquire fill from an outside source at its own expense to complete the parkway to its final grades and elevations. Brewster, prior to submitting its bid, determined through tests that petitioners' property could provide the requisite quantity and quality of earth fill and approached petitioners to inquire whether it could buy from them property from which the fill could be obtained, or buy the fill itself. Petitioners refused to sell any of their property, but agreed to permit Brewster to buy fill from certain sections of their property. On May 1, 1953, an agreement was entered into between petitioners *267 and Brewster which provided, in part, as follows: WHEREAS, * * * [Brewster] desires to purchase from * * * [petitioners] earth fill to be excavated from portions of the above described premises. * * * the said * * * [petitioners] hereby agrees to permit * * * [Brewster], its agents and servants, to enter into and upon and leave from the above described premises over existing roadways with all necessary equipment therefor, and to excavate and remove from the said premises earth fill or other material therefrom in conformity with and according to the Grading Plan approved and signed by both parties hereto * * *, and * * * [Brewster] agrees to complete the excavation and grading in accordance with the aforesaid Grading Plan. * * * Any material excavated and removed from the said property shall become the property of * * * [Brewster] * * *. * * * [Brewster] agrees to pay unto * * * [petitioners], the sum of Five Cents ($.05) per cubic yard for all material removed from said property. It is further understood and agreed between the parties hereto that a minimum quantity of 400,000 cubic yards is to be removed from said property and that this minimum quantity is based *268 on the original borrow material requirements of 795,700 cubic yards as specified on the contract made between [Brewster] * * * and the New Jersey Highway Authority-Garden State Parkway * * *. Notwithstanding the provisions herein with respect to the minimum quantities called for under this Agreement, it is expressly understood and agreed that should the New Jersey Highway Authority reduce the original borrow material requirements on the aforesaid contract, then and in that event the minimum quantities called for herein and the total amount payable hereunder will be reduced accordingly. It is agreed by and between the parties hereto that should the aforesaid minimum quantity be decreased or increased * * * [Brewster] will provide * * * [petitioners] with a Revised Grading Plan, if requested by * * *[petitioners], which Revised Grading Plan shall reflect the grades and appearances of the premises based upon such increase or decrease. * * * all payments will be made on or about the 15th day of each month for material excavated, removed and used in the performance of the aforesaid contract during the preceding month. * * * [Brewster] hereto advances to * * * [petitioners] *269 on account of this agreement, the sum of Five Thousand Dollars ($5,000.00) to be credited against payments due hereunder. The borrow material being purchased under this contract is required to meet specifications provided by the New Jersey Highway Authority. It is understood and agreed that * * * [Brewster] shall not be required to take or remove any material which does not meet such specifications and that if there shall not be sufficient quantities available which shall meet such specifications in the area involved in this contract, * * * [petitioners] will allow * * * [Brewster] to enter into and acquire further areas within which to remove suitable borrow material * * *. IT IS AGREED by and between the parties hereto that * * * [Brewster] will remove and stockpile outside of the adjacent grading limits all top soil from any part of said premises from which material is excavated and to respread all or part of top soil upon the graded area, at the termination of the operation if requested by * * * [petitioners], for the sum of Twenty-five Hundred Dollars ($2,500.00), said sum to be deducted from payments due hereunder. * * * Attached to the May 1, 1953, agreement *270 is a map of petitioners' property showing the area from which Brewster was to remove earth fill and the depth of the excavation to be made in order that Brewster might obtain the 400,000 cubic yards of fill which it originally estimated would meet its requirements. As work on the highway progressed Brewster needed more fill than was originally estimated. The total quantity ultimately taken from petitioners' property during the period July 1953 to August 1954 was in excess of one million cubic yards. Each time Brewster needed additional material, Laudenslager and Branham or Brewster's chief engineer went to petitioners' property, decided upon the area from which such material could be taken, and established an elevation down to which the material could be removed, that would coincide with and match the elevation on an adjoining area from which material had already been taken. The fill was ordinary, sandy loam, generally characteristic of the area in which petitioners' property was located and had no intrinsic value, by and of itself. It was the proximity of petitioners' property to the section of the roadway being constructed that made the property valuable as the source for obtaining *271 fill required in the construction of the road. If Brewster had excavated more fill than it needed, it could not have sold it because there was no market for it. The area that was excavated by Brewster had been used by petitioners for growing farm crops. Brewster complied with the provisions of the May 1, 1953, agreement requiring it to remove and stockpile the topsoil before excavating the fill. At petitioners' request, and in accordance with the agreement, Brewster respread the topsoil when the work of excavation had been completed, and petitioners paid Brewster the agreed price therefor. After the excavation of the fill and the respreading of the topsoil, the area would have required several years of rehabilitation before it could be used for growing crops. Petitioners were not engaged in the business of buying and selling real estate. Except for the transaction with Brewster, petitioners never sold or excavated any dirt, earth or other material from their property. Petitioners did not participate in the work of excavating the fill, and did not share in any profit or income derived by Brewster from the use of the fill in the construction of the highway. Because of the coming *272 of the parkway and the resulting change in the character of the area in which their property was located, petitioners had decided, prior to the sale to Brewster, to sell the property for housing development purposes. By agreement dated January 27, 1954, petitioners agreed to sell, and did sell, all of their property except the buildings and land surrounding the buildings which they reserved for themselves. The agreement of January 27, 1954, was modified by supplemental agreements dated April 14, 1954, and May 20, 1954. The usefulness of petitioners' property for housing development purposes was neither impaired nor enhanced by the removal of the fill. Amounts received by petitioners from Brewster during the taxable years were as follows: Date of
Payment
Amount
5/12/53
$ 5,000.00 (advance)
8/11/53
1,250.00
9/16/53
3,750.00
10/13/53
8,000.00
11/11/53
6,000.00
12/12/53
5,000.00
Total for 1953
$29,000.00
1/16/54
6,000.00
10/27/54
$16,809.00
Less: charges
for respread-
ing topsoil
2,500.00
14,309.00
Total for 1954
20,309.00
Total for both years
$49,309.00 Respondent determined that these amounts were taxable *273 as ordinary income. Opinion RAUM, Judge: The contract of May 1, 1953, between petitioners and Brewster permitted Brewster to enter on their land and excavate and remove earth fill; it required Brewster to pay five cents per cubic yard for all fill excavated and removed. It provided that a minimum quantity of 400,000 cubic yards was to be removed, but that if Brewster's requirements should be reduced the minimum quantity would be reduced accordingly. It also provided that Brewster would not be required to take any material that did not comply with the specifications in its contract with the New Jersey Highway Authority and that if there was not a sufficient quantity of suitable material in the area covered in the agreement Brewster would be permitted to enter other areas to remove needed earth fill. As work progressed on the highway, Brewster needed more earth fill than was contained in the area covered by the May 1 contract and was permitted to satisfy its needs from other parts of petitioners' land. The total amount of fill excavated and removed from their land by Brewster was in excess of 1,000,000 cubic yards. In Samuel L. Green, 35 T.C. 1065, decided this day, *274 we considered the question whether income received under contracts which did not differ materially from the Brewster contract herein was taxable as ordinary income or long-term capital gain. We held that it was taxable as ordinary income and indicated the considerations taken into account in reaching this conclusion. We similarly find here that petitioners did not sell the earth fill "in place", that, pursuant to their contractual arrangements with Brewster, they sold such material from time to time as it was extracted and removed, and that they, rather than Brewster, owned the deposits prior to extraction. Accordingly, we must hold here, as we did in the Green case, that petitioners did not sell a capital asset, and that the payments which they received from Brewster in 1953 and 1954 are taxable as ordinary income. Decision will be entered under Rule 50.